# UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY



MARTIN LUTHER KING JR. FEDERAL BLDG. & U.S. COURTHOUSE
50 WALNUT STREET, P.O. BOX 419
NEWARK, NJ  07101-0419
**(973) 645-6340**

**WILLIAM J. MARTINI**
    **JUDGE**

## LETTER OPINION

September 21, 2007

Shelley Ann Weinberg
17 Academy Street
Suite 706
Newark, NJ 07102
    *(Attorney for Plaintiff)*

Sandra M. Grossfeld
Special Assistant United States Attorney
c/o Social Security Administration
Office of the General Counsel
26 Federal Plaza, Room 3904
New York, New York 10278
    *(Attorney for Defendant)*


    RE:    <u>**O'Donnell v. Commissioner of Social Security**</u>
             <u>**Civ. No. 06-1781 (WJM)**</u>

Dear Counsel:

    Plaintiff Anna L. O'Donnell ("O'Donnell") brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, seeking review of a final determination by the Commissioner of Social Security ("Commissioner") denying O'Donnell's application for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  There was no oral argument.  Fed. R. Civ. P. 78.  For the following reasons, the Commissioner's decision is **AFFIRMED**.

1

## Background and Procedural History

In March 2003, O'Donnell filed concurrent applications for DIB and SSI, alleging disability due to carpal tunnel syndrome and back and cervical spine disorders as of December 14, 2001.  (R. at 100-102, 119, 447-449.)  O'Donnell's applications were denied initially and on reconsideration.  (R. at 28-29.)  Upon O'Donnell's request, a hearing was held before Administrative Law Judge Denis G. Katz ("ALJ") on August 8, 2005.  (R. at 19.)  O'Donnell appeared at the hearing with counsel.  (R. at 495.)

In a decision dated August 10, 2005, the ALJ denied O'Donnell's application for benefits.  (R. at 19-26.)  Applying the Commissioner's five-step analysis for determining eligibility for DIB and SSI, the ALJ first found that Plaintiff was not engaged in substantial gainful activity from the time of the alleged onset of her impairments.  (R. at 20.)  At step two, the ALJ determined that O'Donnell's impairments–carpal tunnel syndrome, back pain, and left ulnar neuropathy–were severe.  (R. at 20.)  At step three, however, the ALJ found that these impairments, either alone or in combination, did not meet or equal any of the impairments listed in 20 C.F.R. § 404, Subpart P, App. 1.  (R. at 20.)  Therefore, the ALJ continued to step four and determined that O'Donnell could not perform her past relevant work.  (R. at 24.)  Finally, at step five, the ALJ found that based on O'Donnell's age, education, and work experience, she could perform jobs available in significant numbers in the regional economy, notwithstanding her diminished residual functional capacity ("RFC").  (R. at 24-25.)  On August 26, 2005, O'Donnell filed a request for review of the ALJ's decision.  The Appeals Council denied review on February 14, 2006, and therefore, O'Donnell has exhausted all administrative remedies.  (R. at 9, 14.)

O'Donnell appeals the Commissioner's ruling and argues that the ALJ's decision was not supported by substantial evidence.  Specifically, she contends that the ALJ erred in finding that: (1) her cervical spondylosis (condition of the cervical spine) and residual impairments from her cervical spine surgery were not severe and did not meet an applicable listing; (2) O'Donnell retained the RFC to perform either light or sedentary level work with certain limitations; and (3) O'Donnell could perform any of the jobs that the vocational expert suggested at the August 8, 2005 hearing.  This appeal is now before the Court.

## Standard of Review

The district court reviews the factual findings of the Commissioner to determine whether they are supported by substantial evidence.  *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).  When substantial evidence upon which the ALJ can base

his factual findings exists, this Court is bound by those determinations of the ALJ. *See id.* (citing 42 U.S. § 405(g)). Substantial evidence is "less than a preponderance of the evidence but more than a mere scintilla." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (quoting *Jesurum v. Sec'y of the U.S. Dep't of Health & Human Srvcs.*, 48 F.3d 114, 117 (3d Cir. 1995)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Under the substantial evidence standard, the district court is required to review the record as a whole. *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 431 (3d Cir. 1999). If there is more than one rational interpretation of the evidence in the record, this Court must accept the conclusions of the ALJ and affirm his decision. *See Izzo v. Comm'r of Soc. Sec.*, 186 F. App'x 280, 284 (3d Cir. 2006) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Court is "not permitted to weigh the evidence or substitute [its] own conclusions for that of the fact-finder." *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002) (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)). Overall, the substantial evidence standard is a deferential standard of review, which requires deference to inferences drawn by the ALJ from the facts, if they are supported by substantial evidence. *Schaudeck*, 181 F.3d at 431.

## Discussion

### I.     The ALJ's determination that O'Donnell's cervical spondylosis and lingering cervical spine pain were not 'severe' impairments is supported by substantial evidence.

Although O'Donnell's specific arguments on this point are not entirely clear, O'Donnell generally argues that her cervical spondylosis (a condition of the cervical spine) and lingering pain from her cervical spine surgery were not properly considered by the ALJ because: (1) the ALJ failed to find that these conditions were severe at step two; and (2) the ALJ failed at step three to consider these conditions along with or in combination with the impairments that the ALJ found to be severe.[1] (Pl.'s Br. 9-12.) The

---

[1] To the extent that O'Donnell appears to argue that the ALJ did not consider any of O'Donnell's conditions severe, the Court directs her attention to the ALJ's findings that her carpal tunnel, left ulnar neuropathy, and back problems were severe. (R. at 20.) Furthermore, to the extent that O'Donnell argues that the ALJ failed to consider the severity of O'Donnell's symptoms in combination, the Court notes that the ALJ fully discussed O'Donnell's cervical discomfort which led to her cervical spine surgery as well as the improvements in symptoms and pain following the surgery. (R. at 21.) As Dr. Stephanie Jones, O'Donnell's treating physician, noted in June 20, 2004, O'Donnell's most significant problem is "pain in the upper extremities related to bilateral carpal tunnel syndrome and left ulnar neuropathy." (R. at 425.) After analyzing O'Donnell's history and O'Donnell's subjective complaints, the ALJ appropriately concluded that the only severe impairments were O'Donnell's carpal tunnel syndrome, back problems, and left ulnar neuropathy. (R. at 20.)

court finds that each of O'Donnell's arguments is without merit and that the ALJ's determinations at steps two and three are supported by substantial evidence.

In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). An impairment is "severe" if it significantly limits a claimant's ability to do basic work activities. The impairment must last or be expected to last for a continuous twelve month period. 20 C.F.R. § 404.1509. If the Commissioner determines that the claimant is suffering from a severe impairment, the inquiry at step three is whether the claimant's impairment(s) meets or equals a listing set forth in 20 C.F.R. § 404 Subpart P, App. 1. 20 C.F.R. § 404.1520(d). A claimant whose impairment meets or equals a listing is presumed disabled. *Id*. The analysis, however, proceeds to steps four and five if the Commissioner determines that the claimant's impairments do not meet or equal a listing. *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).

O'Donnell's history of complaints of pain in her upper extremities along with the various attempts to diagnose the cause of the complaints are well documented. In May 2001, O'Donnell was diagnosed with bilateral forearm tendonitis and was told to avoid keyboarding, typing, and using a mouse at work. (R. at 202.) Following this diagnosis, O'Donnell was treated for tendonitis for several months with little success. She eventually came under the care of Dr. Stephanie Jones in October 2001, a pain specialist, who initially believed that O'Donnell suffered from disc protrusion, repetitive motion symptoms, tendonitis of her forearm, and possibly bilateral ulnar entrapment syndrome. (R. at 323-324.) Because of O'Donnell's conditions, Dr. Jones limited her workday to six hours a day with no more than four hours at a time using the computer, and instructed her to avoid lifting more than ten pounds at a time and repetitive lifting in general. (R. at 324.)

To analyze the cause of O'Donnell's continuing pain in her upper extremities, O'Donnell was seen for a neurological consult, which showed that a disc protrusion was likely contributing to O'Donnell's pain. (R. at 371-372.) In November 2001, Dr. Jones treated O'Donnell with a course of three cervical epidural steroid injections. (R. at 319-321, 317.) This treatment resulted in a reported thirty percent improvement in pain. On December 14, 2001, Dr. Jones more specifically diagnosed O'Donnell with disc protrusion, left ulnar neuropathy, bilateral carpal tunnel syndrome, and secondary depression and sleep deprivation and determined that O'Donnell should "continue her work status at 6 hours per day." (R. at 317-18.) A week later, Dr. Jones determined that O'Donnell should take a leave of absence from work for a couple of weeks. (R. 346.) O'Donnell alleges that she stopped working on December 14, 2001 due to her medical condition. (R. at 21.)

On February 14, 2002, Dr. Jones noted that O'Donnell was not working and that she reported feeling better. (R. at 315.) Dr. Jones, however, recommended that O'Donnell continue in "off-work" status until after her CT myelogram. *Id*. O'Donnell's continued improvement was documented by Dr. Jones in February 28, 2002. (R. at 314.) Nevertheless, Dr. Jones recommended that she remain in "off-work status" until an evaluation with Dr. Arnold Vardiman, a neurosurgeon. *Id*.

After consulting with Dr. Vardiman, O'Donnell underwent a cervical decompression and fusion surgery in May 2002.[2] (R. at 275, 306.) In June 2002, Dr. Jones reported that O'Donnell was doing "extremely well." After noting O'Donnell's continued improvement, Dr. Jones reported that O'Donnell's pain medication regime "keep[s] her functional." (R. at 302.) By April 2003, the medical record reflects a successful surgery with a significant reduction in pain reported by O'Donnell. (R. at 301.) Furthermore, O'Donnell self-reported to Dr. Jones that she was "okay" as long as she leads a very sedentary life. *Id*.

Contrary to O'Donnell's assertions, the ALJ appropriately considered her cervical spine condition and residual pain from cervical spine surgery. The ALJ, however, found that these conditions were not severe because O'Donnell's symptoms associated with those conditions, as opposed to her other severe impairments, improved in the months following cervical spine surgery in May 2002.[3]

The medical record supports the ALJ's finding that her cervical spine condition and residual pain from cervical spine surgery did not continue for the requisite one-year duration and did not significantly limit her ability to meet the physical or mental demands of any basic work activity as required under 20 C.F.R. § 404.1520(c). (R. at 21.) Dr. Vardiman, the doctor who preformed the cervical spine surgery in May 2002,[4] reported that O'Donnell was doing well after the surgery in June 2002 and had only intermittent spasms and no cervical radicular symptoms. (R. at 285.) By September 6, 2002, O'Donnell was "well healed," she ambulated in a smooth directive fashion, and her motor, sensory, and reflex examinations were normal. (R. at 283.) Furthermore, Dr.

---

[2] The Court notes that O'Donnell's cervical spine surgery was performed in May 2002, not May 2003 as set forth in O'Donnell's brief. (Pl's. Br. 7.)

[3] There is some question in the medical records as to the exact cause of O'Donnell's alleged upper extremity pain. Regardless of the exact diagnosis of O'Donnell's condition, the relevant inquiry is whether the evidence supports the ALJ's findings as to the effect of the symptoms on O'Donnell's ability to function. Thus, the Court reviews the record to assess whether substantial evidence supports the ALJ's determinations as to the severity of O'Donnell's physical and functional limitations as well as the impacts that such limitations have on her ability to work.

[4] O'Donnell's cervical spine surgery comprised of a cervical decompression and fusion with an autograft. (R. at 277-79.)

Vardiman noted that although O'Donnell had a "fair amount" of muscle spasms, she was "doing quite well." (R. at 283.) By January 2003, O'Donnell reported to Dr. Vardiman that the problems and pain that she had complained of before the surgery–e.g., pain in the shoulder, girdle, and chest–were all resolved. (R. at 281.) Although Dr. Vardiman noted in September 2003 that O'Donnell was still having ongoing cervical and paracervical discomfort and upper extremity pain, he noted that the surgery had resulted in a "satisfying fusion" with no evidence of hardware failure or focal motor deficits. (R. 349.) Furthermore, Dr. Vardiman stated that O'Donnell felt that her symptoms had improved. *Id*.

O'Donnell's treating physician reported similar improvements. Prior to her surgery, O'Donnell reported to Dr. Jones that her "[a]verage pain level was 7 to 9/10." (R. at 323.) After her surgery, O'Donnell began to report substantial reductions in pain in her upper extremities. For example, in a progress report dated June 13, 2002, Dr. Jones noted that O'Donnell was doing "extremely well" after her May 2002 surgery, and that her pain level had decreased to 2 to 4/10. (R. at 306.) An additional report from Dr. Jones in October 2002 found that O'Donnell was "doing quite a bit better" and that her pain level was 2/10. (R. at 303.) In January 2003, Dr. Jones reported that although O'Donnell was by no means pain free, O'Donnell's "pain medication regimen does keep her functional and helps with the pain." (R. at 302.) As discussed by the ALJ in his decision, these significant improvements throughout the year supported the ALJ's conclusion that O'Donnell's symptoms specific to her cervical spine condition and residual pain from surgery were not severe.[5] (R. at 21-22.)

O'Donnell's subjective complaints of pain following the cervical spine surgery were also properly considered by the ALJ. (R. at 23-24.) O'Donnell testified at the hearing before the ALJ that she received little relief from the cervical spine surgery. (R. at 500.) However, the ALJ found that O'Donnell's testimony was not fully credible in light of the objective evidence in the record. (R. at 23-24.) The ALJ noted that Dr. Jones's reports reflect a successful surgery with a significant reduction in pain as reported by O'Donnell. (R. at 301-306.) Affording great weight to O'Donnell's treating physician and properly considering the entire record, the ALJ concluded that, after surgery in May 2002, O'Donnell's cervical spine condition and lingering post-surgery pain did not significantly limited her ability to perform basic work functions, and therefore, did not constitute a severe impairment. The Court cannot find that the ALJ's assessment was

---

[5] The ALJ did not find that O'Donnell was entirely free from pain or other impairments. In January 2003, Dr. Jones also noted that O'Donnell continues to have problems and pain in her left arm with an average pain level of 3/10. (R. at 302.) Thus, the ALJ appropriately associated the "shoulder, back and arm pain" and O'Donnell's accompanying functional limitations with her carpal tunnel, back pain, and left ulnar neuropathy–impairments which he found to be severe. (R. at 20-23.)

unsupported by substantial evidence.

O'Donnell also appears to take issue with the ALJ's determination at step three that her impairments do not render her per se disabled. (Pl.'s Br. 12.) Step three requires the Commissioner to determine whether the severe impairments, considered individually or in combination, meet or equal a listing set forth in 20 C.F.R. § 404, Subpart P, App. 1. First, the Court notes that O'Donnell does not discuss which listing she believes her impairments equal. Second, the ALJ after a substantial discussion of O'Donnell's medical history concluded that these impairments did not meet the clinical criteria contained in the listings. It is of no consequence that the ALJ failed to identify which listing he considered. *See Ochs v. Comm'r of Social Security*, 187 Fed. Appx. 186 *8 (3d Cir. 2006). The Court is satisfied that the ALJ's review of the medical record was sufficient for a meaningful review by the Court, and his decision that O'Donnell's impairments did not meet or equal a musculoskeletal system listing is supported by substantial evidence.

## II.     The ALJ's determination of O'Donnell's RFC was supported by substantial evidence.

O'Donnell next argues that the ALJ erred in finding that she is able to perform a limited range of light and sedentary work. (Pl.'s Br. 13-20.) Specifically, O'Donnell asserts that: (1) her RFC is less than sedentary when only her exertional limitations are considered; and (2) her non-exertional limitations render her unable to perform any jobs in the national economy. *Id*. The Court disagrees.

RFC is an administrative assessment of the upper limit of work a claimant is able to perform given the limitations imposed by her impairments. 20 C.F.R. §§ 404.1545 and 416.945. This determination is an issue generally reserved to the Commissioner. 20 C.F.R. § 404.1527(e)(2). In making a residual functional capacity determination, the ALJ, however, must consider all the evidence before him. *See Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000). Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence that he rejects and his reasons for discounting such evidence. *Id*.

Substantial evidence supports the ALJ's finding that: (1) O'Donnell could sit, stand, and walk for eight hours per day; (2) O'Donnell could lift and carry objects weighing up to ten pounds; (3) O'Donnell could perform fine manipulations up to two-thirds of the day; and (4) O'Donnell could not perform repetitive pushing or pulling. (R. 25-26.) The ALJ noted the State agency physician's opinion that a review of O'Donnell's medical history indicated that O'Donnell could: occasionally lift fifty pounds; lift twenty-

five pounds frequently; stand and/or walk with normal breaks for a total of about six hours; sit with normal breaks for a total of about six hours; and could push and pull without limitation. (R. 330.) Although this assessment indicated that O'Donnell could preform medium exertional work, it is clear that the ALJ properly considered the entire record giving particular consideration to the opinion of O'Donnell's treating physician, Dr. Jones. (R. 24.) Early in O'Donnell's medical history, Dr. Jones limited O'Donnell to lifting no more than ten pounds with any single lift and no repetitive lifting in general. (R. 324.) Approximately two years later on September 26, 2003, Dr. Jones wrote that O'Donnell had "to avoid repetitive motion of her upper extremities and even light lifting could make her worse." (R. 340.) Furthermore, O'Donnell was to "avoid pushing and pulling." (*Id*.) There was no mention of further exertional limitations in Dr. Jones's assessment. Giving greater weight to the medical opinion of O'Donnell's treating physician, the ALJ properly determined that O'Donnell held the RFC to perform certain aspects of light to sedentary work (involving the occasional lifting of no more than ten pounds) which does not require fine manipulation more than two-thirds of the time during a typical workday and does not require repetitive pushing and pulling.

Contrary to O'Donnell's argument, it is further clear that the ALJ gave appropriate consideration to O'Donnell's subjective complaints of pain and its accompanying limitations on her ability to work. The ALJ acknowledged that O'Donnell suffered several medically determinable impairments, but considered her representations regarding the extent of her limitations and pain to be inconsistent and not corroborated by the objective medical evidence. (R. 24.) Thus, the ALJ found O'Donnell's representations as to the severity, duration, and effect of her condition to lack credibility.

It is well-established that an ALJ may determine the extent to which the claimant is accurately stating the degree of pain or the extent to which she is disabled by it. *See Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) (citing 20 C.F.R. § 404.1529(c)). O'Donnell's mere statements about her pain without the support of objective medical evidence are insufficient to establish disability. *See* SSR 96-7p (stating that symptoms unsupported by "medical signs and laboratory findings" cannot support a determination of disability). The ALJ must consider all evidence in the record, and "may weigh the credibility of the evidence,...giv[ing] some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000). Although O'Donnell testified that she could not lift a gallon of milk with two hands comfortably, and that she could not lift a quart of water with one hand without pain, the ALJ noted that Dr. Jones only limited O'Donnell to lifting no more than ten pounds in October 2001. (R. at 323-324, 503.) Thus, the ALJ did not give great weight to her testimony regarding her exertional limitations. Furthermore, the ALJ noted that the reductions in pain as reported by O'Donnell and her treating physicians lent

weight to Dr. Jones's and the State agency physician's assessments of O'Donnell's exertional limitations. (R. at 21, 23-24.) Thus, the ALJ's determination of O'Donnell's exertional RFC limitations was supported by substantial evidence.

Additionally, it is clear that the ALJ gave appropriate consideration to her non-exertional subjective complaints, including drowsiness, impaired manipulation and dexterity, postural limitations, and motor coordination. First, the Court notes that there is no medical evidence to support O'Donnell's assertion that she suffers from impairments in posture, motor coordination, or dexterity and manipulation (other than fine manipulation). Although O'Donnell testified to certain pain-related postural and movement restrictions, the ALJ properly determined that O'Donnell's subjective complaints were not supported by the objective medical evidence in the record. (R. at 24, 503-06.) Thus, the ALJ properly discounted O'Donnell's testimony regarding the extent of her pain and its effect on her.

O'Donnell's assertion that she needs to take unscheduled naps throughout the day is similarly not supported by the medical evidence. According to O'Donnell's application for disability, she stated that her primary disability was related to pain. (R. 149.) At the hearing, O'Donnell testified that she suffers from various side effects caused by her numerous pain medications. Among her chief complaints is severe drowsiness that forces her to take naps throughout the day and makes it difficult for her to concentrate. (R. at 505, 511.) Dr. Jones's letter of September 26, 2003 notes that the medications which keep O'Donnell functional do "cause her some sedation." (R. 340.) However, many medications cause drowsiness, and drowsiness in and of itself is not disabling unless there is sufficient evidence in the record which demonstrates that the drowsiness causes serious functional limitations. *See Burns v. Barnhart*, 312 F.3d 113, 131 (3d Cir. 2002).

Apart from O'Donnell's self-reports that she needs to take naps, there is no objective evidence to support O'Donnell's allegations that her drowsiness is such that it causes serious functional limitations or that she needs to take naps through the course of the day.[6] To the contrary, Dr. Jones states that O'Donnell is "functional" on her medication regimen. (R. at 425.) Moreover, Dr. Jones's letters, dated September 26, 2003 and June 20, 2004, does not add any further restrictions than those set forth in Dr. Jones's initial October 2001 assessment of O'Donnell. (R. at 340, 425.) In sum, the ALJ considered O'Donnell's subjective complaints of medication-induced fatigue but found

---

[6] O'Donnell testified at the August 8, 2005 hearing that she needed to take naps. The only evidence of sedation was O'Donnell's own statements to Dr. Jones on January 29, 2003 and Dr. Magaly Marrero, a psychologist, on June 24, 2003. (R. at 302, 327.) The ALJ, however, determined that O'Donnell's testimony regarding her need to nap lacked credibility and thus, weighed her testimony appropriately.

9

that they were not supported by the objective evidence in the record.

As discussed above, the ALJ undertook a detailed and thorough analysis of the evidence in reaching his conclusion.  He discussed the various factors that should be considered in determining a claimant's RFC, and he listed the evidence that could be relied upon in weighing these various factors.  (R. at 20-24.)  The ALJ then relied upon his particularized findings regarding the medical evidence submitted and concluded that O'Donnell had the RFC to perform sedentary work with additional limitations regarding the reduced use of fine manipulations and a prohibition on repetitive pushing and pulling.  *Id*.  Thus, there is substantial evidence in the record to support the ALJ's determination regarding O'Donnell's RFC.

### III.   Substantial evidence supports the ALJ's decision that O'Donnell can perform jobs suggested by the vocational expert.

After finding that O'Donnell could no longer perform her past relevant work as a keyboard operator, the Commissioner bears the burden of proving that there are jobs in significant numbers in the national economy that O'Donnell can perform, considering O'Donnell's RFC, age, education, and work experience.  Under federal regulations, the responsibility for assessing whether a claimant's residual functional capacity allows him to pursue other work lies with the ALJ, who is required to consider "all of the relevant medical evidence and other evidence." 20 C.F.R. § 404.1545(a)(3); 20 C.F.R. § 404.1546(c).  An ALJ may rely upon the testimony of a vocational expert with respect to the existence of jobs in the national economy that a claimant with particular limitations could perform.  *See* 20 C.F.R. §§ 404.1566, 416.966.

It is clear that the ALJ reviewed and considered all of the relevant evidence.  First, the ALJ noted that O'Donnell was 44-years-old on her alleged onset date, had a high school education, and had skilled work experience as an office worker.  (R. at 24.)  Based upon his RFC analysis, he further noted that O'Donnell retained the RFC for certain light to sedentary level work with additional restrictions on the performance of fine manipulations to no more than two-thirds of the typical work day and no repetitive pushing or pulling.  *Id*.  As the ALJ determined that O'Donnell was limited by certain non-exertional limitations, he relied on the testimony of a vocational expert, who had reviewed the vocational information in this case, to determine whether there existed sufficient jobs in the national economy that O'Donnell was capable of performing with her particular background and RFC.  The vocational expert, Donald Slive, testified that O'Donnell's past work as a customer service representative and data entry clerk are considered skilled positions that require physical demands ranging from light to sedentary work.  (R. at 510.)  Then, the vocational expert opined that a person of O'Donnell's age,

education, and work experience who was unable to perform fine manipulations more than one-third of the work day, had to alternate positions between sitting and standing, and would be limited to lifting and carrying no more than five pounds, would be able to perform the jobs of surveillance system monitor and sub-assembler. (R. at 511-12.)

O'Donnell argues unsuccessfully that the ALJ erred in finding that O'Donnell could perform the job of sub-assembler. Although the job of sub-assembler is classified under the United States Department of Labor's *Dictionary of Occupational Titles* as light work requiring the lifting of no more than twenty pounds with frequent lifting or carrying of ten pounds, the ALJ was entitled to accept the vocational expert's reasonable explanation of the requirements of the job based upon his expertise. *See* SSR 00-4p. Social Security Ruling 00-4p requires that the ALJ ask the vocational expert whether any possible conflict exists between the vocational expert's testimony and the DOT, and that if the testimony does appear to conflict with the DOT, to "elicit a reasonable explanation for the apparent conflict." The Ruling requires that the explanation be made on the record and that the ALJ explain in his decision how the conflict was resolved. In this case, the vocational expert voluntarily pointed out that the job of sub-assembler required light work according to the DOT. (R. at 511-12.) The vocational expert then further explained that despite the DOT designation, his experience regarding this profession was that the job required lifting no more than five pounds and requires only gross manipulation. The ALJ had previously found that O'Donnell could preform some aspects of light level work consistent with the vocational expert's description of the sub-assembler job. (R. at 25.) Thus, the ALJ's reliance on the vocational expert's expertise was proper.[7]

It is well-established that an ALJ's hypothetical to a vocational expert must accurately portray the claimant's impairments that are supported by the record. *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987). Despite O'Donnell's assertions to the contrary, the ALJ's hypothetical to the vocational expert accurately reflected O'Donnell's impairments. Because there is no objective medical evidence in the record to support O'Donnell's claims that she needed to take unscheduled breaks or naps during the day, was limited to lifting less than five pounds, had no bilateral dexterity, had to change positions frequently, could not walk, sit, or stand for prolonged periods of time, had postural limitations, and had impaired attention and concentration, the ALJ properly excluded those alleged limitations from the hypothetical that he posed to

---

[7] Even if the Court were to find, which it does not, that O'Donnell could not perform the job of sub-assembler, the vocational expert and ALJ identified an additional sedentary job available to O'Donnell–surveillance system monitor. (R. at 510-511.) As the ALJ need only identify one occupation, the ALJ's decision that there are jobs existing in significant numbers in the national economy that O'Donnell could perform is supported by substantial evidence. *See* 20 C.F.R. § 404.1566(b).

the vocational expert. Here, the ALJ's hypothetical included all of the impairments that he found to be supported by the record. Thus, the ALJ, giving proper consideration to the vocational expert's testimony, found that there are a significant number of jobs in the national economy that O'Donnell could perform.

In sum, the Court finds that the ALJ's determination of O'Donnell's lack of disability is supported by substantial evidence. It is clear that the ALJ reviewed and considered the complete medical record and O'Donnell's subjective allegations of pain and disability. The ALJ's decision is reasoned and well documented with citations to the medical evidence in this case. Although the Court is sympathetic to O'Donnell's history of pain relating to her upper extremities, the Court finds that the ALJ's denial of SSI and DIB benefits is sustained.

## Conclusion

For the foregoing reasons, the ALJ's decision to deny SSI and DIB benefits to O'Donnell is **AFFIRMED**. An appropriate Order accompanies this Opinion.

s/William J. Martini  
William J. Martini, U.S.D.J.